**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>vs.<br><br>JESSE JON HARBACH,<br>    Defendant. | Case No. 25-cr-2059-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

———————————

**TABLE OF CONTENTS**

<u>Page</u>

*I.*    *INTRODUCTION*.................................................................2

*II.*    *FINDINGS OF FACT*..........................................................4

　　*A.*    *The Search Warrant* .................................................5

　　*B.*    *The Sniff by the Police Service Dog* ...........................10

　　*C.*    *Special Agent Mulnix's testimony* .............................15

*III.*    *DISCUSSION*..................................................................17

　　*A.*    *The Parties' Arguments* ...........................................17

　　*B.*    *Whether the traffic stop based on Defendant's suspended license was unconstitutional* ............................................20

　　　　*1.*    *Relevant law* ..............................................20

　　　　*2.*    *Analysis* ...................................................21

1

C.     *Whether the drug investigation created a basis to stop and/or search the 4Runner* ...................................................................**29**

     1.     *Relevant law* ...........................................................**30**

     2.     *Analysis* .................................................................**32**

D.     *Whether Police Service Dog's sniff resulted in probable cause* ...........**41**

     1.     *Relevant law* ...........................................................**41**

     2.     *Analysis* .................................................................**42**

E.     *Whether the search warrant contains probable cause if the Police Service Dog's sniff is excised* ....................................................**43**

     1.     *Relevant law* ...........................................................**43**

     2.     *Analysis* .................................................................**47**

F.     *Whether the* **Leon** *good faith exception applies* ...........................**48**

     1.     *Relevant law* ...........................................................**48**

     2.     *Analysis* .................................................................**50**

IV.     *CONCLUSION* ...............................................................**52**

## I.     INTRODUCTION

On October 7, 2025, the Grand Jury returned an Indictment charging Defendant with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A), and 846, and one count of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A).  (Doc. 4.)

The matter before me is Defendant's motion to suppress. (Doc. 43.) Defendant's Inventory is referenced in his motion. (Doc. 43.) Defendant seeks to suppress all evidence seized from search on March 10, 2025 (see Search Warrant Inventory Report at Ex. H, p. 37). (*Id*.) The Government filed a timely Response. (Doc. 48.) The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on January 8, 2026. (Doc. 49.)

At the hearing, the following Government Exhibits 1 through 5 were admitted without objection:

1. Detention hearing transcript;

2. Search warrant for a 2008 Toyota 4Runner;

3. Trooper Lippmann's body camera video;

4. PSD[1] Maverick 2024 certifications; and

5. Trooper Lippmann and PSD Maverick training records.

The Government called Iowa State Patrol Trooper John Lippmann as a witness. I found the witness credible.

At the hearing, the following Defendant's Exhibits were admitted without objection:

A. United States Postal Inspection Service ("USPIS") Report of Activity for March 14, 2024;

B. USPIS Report of Activity for November 4, 2024;

C. Iowa State Patrol aerial surveillance video for March 10, 2025;

D. Trooper Lippmann body camera video;

E. Iowa State Patrol K-9 Deployment Detail Report for March 10, 2025;

---

[1] The Iowa State Patrol refers to their trained dogs as "Police Service Dogs" or "PSDs."

3

F. Iowa Deptartment of Public Safety Iowa State Patrol Police Service Dog Programs and Policy Statement;

G. Police Service Dog training records; and

H. March 10, 2025 search warrant for Toyota 4Runner.

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

As described in more detail below, law enforcement became suspicious that packages delivered to a rural Delhi, Iowa address by the United States Post Office between May 2023 and March 2025 contained controlled substances. None of these packages had been searched by law enforcement until after the March 10, 2025 delivery at issue in this case.

The delivery of the package on March 10, 2025 was the subject of law enforcement air surveillance. (Def. Ex. C.) At 9:56 a.m., C.G. appears to have made the first of two attempts to collect a package from the rural Delhi address in a Toyota 4Runner registered to Defendant's mother. Defendant, whose license had been suspended, was first seen driving the 4Runner that day at 10:20 a.m. when he drove to the rural Delhi residence. The air surveillance footage shows Defendant and C.G. pull up in the 4Runner and Defendant exit the vehicle at 11:25:02 a.m. After C.G. collected the package, Defendant entered the passenger door of the 4Runner and C.G. drove away.

Law enforcement then stopped the vehicle at 11:27:17 a.m., i.e., approximately 2 minutes later. Trooper Lippmann arrived soon thereafter and used his Police Service Dog ("PSD" or "Maverick") to conduct a free-air sniff that disclosed the presence of a controlled substance in the 4Runner. The 4Runner was then towed and law enforcement obtained a warrant to search the 4Runner and the package. Ultimately, four pounds of methamphetamine were discovered in the package.

4

*A.*    ***The Search Warrant***

Because one of the issues before the Court is whether the warrant established probable cause, perhaps it is best to start with the statement of facts contained in the supporting affidavit before turning to other evidence in the record.  Government Exhibit 2 is the March 10, 2025 search warrant for the 4Runner and the package.  It provides:

> I, Joshua Mulnix, Special Agent of the Division of Narcotics Enforcement, after being duly sworn on oath, do depose and state as follows:
>
> **Background**
>
> 1) I am a Special Agent with the Iowa Department of Public Safety, Division of Narcotics Enforcement (hereinafter, "DNE") and a sworn peace officer in the state of Iowa.  I am also a Task Force Officer with the United States Postal Inspection Service.
>
> 2) I completed the Iowa Department of Public Safety's (hereinafter, "DPS") 29th Basic Academy, graduating on May 20, 2005. . . .  [Special Agent Mulnix's additional qualifications and experience are set out in paragraphs 2-3 of Government Exhibit 2.[2]]
>
> . . .
>
> **Probable Cause**
>
> 5) This affidavit is made in support of an application for a search warrant for a dark gray 2008 Toyota 4Runner, with VIN number JTEBT14R58K005186, bearing Iowa registration plate LTL 397, hereinafter the "Subject Vehicle." The Subject Vehicle is registered to [R.J.S], of XXX Gay Street, Delhi, Iowa 52223.  The Subject vehicle is currently located at the Delaware County Sheriff's Office, located at 1225 W Howard Street, Manchester, Iowa, and is under the control of the DNE and the Delaware County Sheriff's Office.  The Subject Vehicle is believed to contain controlled substance(s) as well as additional evidence pertaining to the receiving, distribution, and possible use of controlled substances,

---

[2] Agent Mulnix described his qualifications at the October 28, 2025 detention hearing.  (Gov. Ex. 1.)  He has been with the Postal Inspection Service since January 2024 and with the Department of Narcotics Enforcement for 14 years.  (*Id.* at 3-4.)

which evidence includes cellular telephones, United States currency, packaging/parcels utilized to send/receive controlled substance(s) through parcel delivery services, documents/records pertaining to payment for controlled substances received, and/or documents relating to the distribution of controlled substances through the United States mail or other parcel delivery services.

## [Investigation of Packages]

6) During the course of this investigation, I have conducted reviews of United States Postal Service (hereinafter "USPS") business records and other information pertaining to the investigation of suspected drug parcels being sent through the USPS to [XXXX] Pioneer Road, Delhi, Iowa 52223.[3] USPS business records document that between approximately May of 2023 and November of 2024, a total of eighteen (18) parcels addressed to [XXXX] Pioneer Road, Delhi, IA 52223 have been submitted to USPS in Arizona. All of those parcels have been paid for in cash.

7) I was not able to find USPS business records identifying the recipient name or return addresses pertaining to every one of the parcels mailed from Arizona to [XXXX] Pioneer Road, however, I was able to review images of some of those parcels generated by USPS sorting equipment. Of the images of six (6) parcels I was able to review, all of them showed the respective parcels bore the hand-written recipient name, "All Hands Complete Floor Care LLC," (or a close variant, for example, excluding LLC). Five of the parcels bore the hand-written return address "Arizona Wholesale Floors, 124 S. Ironwood Dr. # 2, Apache Junction, AZ 85120." One of the parcels bore the hand-written return address "Country Club Flooring, 1740 S Country Club Dr., Mesa, AZ 85210."

8) I checked Google Maps and observed Google Maps listed [XXXX] Pioneer Road, Delhi, Iowa as the address for All Hands Complete Floor Care LLC. I viewed a Facebook Page for All Hands Complete Floor Care LLC and observed a posting on that page which displayed a picture of a carpet cleaning certificate issued to [J.A.] I reviewed Iowa driver's license and vehicle registration information for [J.A.] which showed he listed his

---

[3] This is the "rural Delhi" address referred to throughout my Report and Recommendation.

residence as [XXXX] Pioneer Road, Delhi, IA 52223.  During the course of this investigation officers have observed a male subject, consistent in appearance with [J.A.] on the property at [XXXX] Pioneer Road.

9) I conducted an open source internet search for Arizona Wholesale Floors, 124 S. Ironwood Dr. # 2, Apache Junction, AZ 85120, and observed the website https://www.arizonawholesalefloors.com.  The aforementioned website purported to be the website for Arizona Wholesale Floors and listed the business address as 124 S. Ironwood Dr. # 2, Apache Junction, AZ 85120.  Google listed additional websites that also showed the aforementioned address as the location for Arizona Wholesale Floors.

10) I conducted an open source internet search for "Country Club Flooring, 1740 S Country Club Dr., Mesa, AZ", and observed search result which showed multiple websites listed that address as a location for The Home Depot.  I observed a page of the www.homedepot.com website which listed 1740 S Country Club Dr., Mesa, AZ 85210 as the location for Home Depot store "Mesa #469."

11) Based on my training and experience, as well as the information identified, reviewed, and documented in this investigation, I believe All Hands Complete Floor Care LLC, Arizona Wholesale Floors, and Country Club Flooring are/were being utilized as names and addresses on suspected drug parcels sent to [J.A.'s] residence in order to make the parcels appear to be legitimate business mail.  I recognized various characteristics of the above-detailed parcels were not consistent with typical business mail, such as the parcels being hand-labeled, paid for in cash, and the various parcels being submitted to USPS from multiple cities which sometimes differed from the city listed in the return address.

12) The parcel bearing the return address of 1740 Country Club Dr., assigned USPS tracking number 4205222395055123747850065628644 (hereafter referred to as the "Subject Parcel"), showed Mesa, AZ as the city in the return address, however, USPS records documented the Subject Parcel was submitted to the mail stream in neighboring Gilbert, AZ.

13) Further indications that the above-detailed USPS parcels contained controlled substance were observed during surveillance operations conducted by law enforcement on November 04, 2024 and March 13,

7

2024.[4]  Law enforcement officers conducted surveillance of the regular USPS delivery of two (2) parcels (one parcel on each of the aforementioned dates) addressed to "All Hands Complete Floor Care LLC, [XXXX] Pioneer Rd., Delhi, IA 52223," with the return address "Arizona Wholesale Floors, 124 S. Ironwood Dr. # 2, Apache Junction, AZ 85120." On both occasions, shortly after the delivery the respective parcel to [XXXX] Pioneer Rd., a subject whom officers video-recorded and visually identified as consistent in appearance with JESSE HARBACH, appeared to leave the residence with the parcels and transport them to a different location(s), within minutes of the parcels' respective deliveries by USPS. HARBACH immediately taking and moving the respective parcels indicated to officers that [J.A.] was not intended to be the final recipient of the parcels, despite the parcels being regularly sent to [J.A.'s] residence.

14) On multiple occasions throughout this investigation I have checked Iowa Driver's License information pertaining to JESSE HARBACH. Information for his Driver's License with an issue date of March 05, 2015, as well as with the update issue date of February 07, 2025 both list HARBACH'S residential address as [XXX] Gay Street, Delhi, Iowa and his mailing address as P.O. Box 303 Delhi, Iowa 52223.  This indicates to me that HARBACH has formally listed addresses for receiving legitimate legal mail addressed to him.  HARBACH obtaining mail items from an address that does not appear to be directly associated with him is consistent with someone receiving illegal substances through the mail.

15) I reviewed driver's license and criminal history pertaining to JESSE HARBACH.  I observed HARBACH had criminal convictions in Iowa and Arizona, as well as driver's license information from Iowa and Arizona.  I observed expired Arizona driver's license information for HARBACH which listed his address (historical) as 1233 E Sea Breeze Dr., Gilbert, AZ 85234.  While I could not definitively know that [J.A.] had no connection to Arizona, based on the driver's license, criminal history and open source records I reviewed pertaining to [J.A.], I did not see any information indicating [J.A.] had traveled to or lived in Arizona. Based on my training and experience I know Arizona is a major source state for controlled substances shipped to other states.

---

[4] Based on Agent Mulnix's testimony (Gov. Ex. 1 at 6) and his report (Def. Ex. A), it seems the correct date is March 14, 2024.

**[March 10, 2025 Surveillance and Stop]**

16) On the morning of March 10, 2025 law enforcement officers conducted surveillance on the regular USPS delivery of the Subject Parcel to the residence at [XXXX] Pioneer Road, Delhi, Iowa. At approximately 9:56 a.m. officers observed the Subject Vehicle, operated by a female who was later confirmed to be [C.G.], stop at the residence. [C.G.] exited the Subject Vehicle, approached the residence, then departed shortly thereafter. Officers observed the Subject Vehicle drive to [XXX] Gay Street, Delhi, where a male subject, subsequently confirmed to be HARBACH, entered the vehicle. Officers observed the Subject Vehicle returned to [XXXX] Pioneer Road at approximately 10:12 a.m., at which time HARBACH and [C.G.] entered the residence. At approximately 10:20 a.m. officers observed HARBACH and [C.G.] depart from [XXXX] Pioneer Road in the Subject Vehicle, with HARBACH driving.

17) At approximately 11:18 a.m. officers observed a USPS mail carrier deliver a parcel to the front of porch of the residence at [XXXX] Pioneer Road. USPS business records confirmed the Subject Parcel was delivered to the residence at that time. At approximately 11:24 a.m. officer observed the Subject Vehicle arrive at [XXXX] Pioneer Road and park near the house. Officers observed HARBACH exit the driver's side of the Subject Vehicle and enter the front passenger door. Officers observed [C.G.] retrieve the Subject Parcel form the residence at [XXXX] Pioneer Road and enter the Subject Vehicle with it. At approximately 11:26 a.m. officers observed the Subject Vehicle leave [XXXX] Pioneer Rd driving North.

18) At approximately 11:27 a.m. officers initiated a traffic stop on the Subject Vehicle. Officers conducting surveillance were aware that HARBACH'S Iowa Driver's license was suspended with 3 withdrawals in effect. HARBACH was arrested and charged for driving while suspended, based on officers' observations leading up to that time. HARBACH had a cellular phone and a stack of United States currency on his person when he was taken into custody. HARBACH'S cell phone and currency were held by law enforcement pending further investigation and this search warrant application.

19) At approximately 11:35 a.m., Trooper John Lippmann, of the ISP, deployed his Police Service Dog (PSD), Maverick, to conduct a free air sniff around the Subject Vehicle. PSD Maverick is a certified narcotics detection dog through Nebraska State Standard. Trooper Lippmann has been working with Maverick since September 2021. Maverick is certified in the detection of the odors of marijuana, methamphetamine, cocaine, and heroin. Maverick was most recently recertified in November 2024.

20) Trooper Lippmann advised that Maverick had indicated to the presence of the odor associated with illegal narcotics during the sniff around the Subject Vehicle at approximately 11:36 a.m.

21) During the course of the traffic stop on the Subject Vehicle, officers observed, in plain sight, through the window, a parcel that appeared to be the Subject Parcel situated on the passenger floorboard. The Subject Vehicle was towed to the Delaware County Sheriff's Office under the supervision of law enforcement. The Subject Vehicle is currently under the control of DNE and the Delaware County Sheriff's Office at that location, in order to keep it secured during the process of this search warrant application.

22) [C.G.] was released from the scene of the traffic stop and transported to a residence of her request in Delhi by officers. [C.G.] stated a cell phone belonging to her was inside the Subject Vehicle. [C.G.] was not allowed to remove anything from the vehicle and this warrant seeks authority to seize cellular phones and cash belonging to [C.G.] and HARBACH, including the phone and cash seized from HARBACH'S person and any cellular phones and/or cash inside the Subject Vehicle.

(Gov. Ex. 2.) The affidavit further described in detail Agent Mulnix's professional understanding of aspects of the drug trade and drug traffickers. These details will be discussed, as necessary, below.

## B.    *The Sniff by the Police Service Dog*

Trooper John Lippmann has been with the Iowa State Patrol since 2019. Prior to that he had been with the Iowa Falls Police Department and the Hardin County Sheriff's Office. He is graduate of the Department of Public Safety Academy and has been a

10

police dog handler since 2020. He completed a 6-to-8-week narcotics camp and an 8-to 11-week patrol camp with PSD Maverick. Maverick is a 6½-year-old, 75-pound German Shepard who has been assigned to Trooper Lippman since 2021. Maverick is a dual-purpose dog, meaning he detects narcotics and also does other tasks such as tracking, evidence recovery, and apprehension. Maverick had no prior training when he was acquired from Southern Coast Kennels, a Florida kennel.

The Iowa State Patrol requires that police service dogs be certified. Maverick was originally certified for narcotics in 2021. Sgt. Ryan Zenor, a certified evaluator for the Iowa State Patrol, was himself certified by the Nebraska State Patrol. Trooper Lippmann was not able to testify specifically about Sgt. Zenor's qualifications. Sgt. Zenor certifies the Iowa State Patrol police service dogs. The Iowa State Patrol utilizes the State of Nebraska's standard for police service dogs because the State of Iowa does not have its own standard. Trooper Lippmann is not aware of any national standard for drug detection dogs. (Lippmann Hr'g Test. at 34-35.)

Trooper Lippmann described the certification process for PSD narcotics detection, such as the 14 different narcotics finds in multiple varied environments from kitchens to barn stalls. Maverick is trained to detect the odors of cocaine, heroin, methamphetamine, and marijuana. Maverick is required to recertify annually, and he has done so on all these odors since his first certification in 2021. He was certified at the time of the hearing. Maverick was certified in March of 2024, i.e., the time of the search in question. (Gov. Ex. 4 at 1, Lippmann H'rg Test. at 14-15.)

Trooper Lippmann and Maverick are required to participate in on-going training of 16 total hours per month combined for all disciplines, that is, narcotics detection, basic patrol, evidence recovery, and tracking. (Lippmann H'rg Test. at 16-17.) Exhibit 5 is comprised of Maverick's "K-9 Training Detail Reports" from March 12, 2024 through March 3, 2025. Occasionally, Iowa State Patrol handlers and dogs train with the

Nebraska State Patrol. (*Id.* at 36.) When Trooper Lippmann and Maverick are in training, Maverick is not actively being handled or sniffing the entire time. (*Id.* at 38.) For example, Defense Exhibit G, a training detail report from February 3, 2025, relates to narcotics detection training from 8:00 a.m. to 2:30 p.m. The report shows Maverick sniffed around a truck that contained methamphetamine and ultimately gave alerts and an indication. Trooper Lippmann testified that it did not take Maverick 6½ hours to indicate on this truck. Trooper Lippmann estimated it normally takes Maverick only 5 to 10 minutes to alert and indicate. (*Id.* at 41.)

For vehicle searches, Trooper Lippmann takes Maverick counterclockwise around the vehicle. Trooper Lippman typically starts Maverick searching into the wind to better detect odor coming from the vehicle.

Trooper Lippmann distinguishes between an "alert" and an "indication." An alert is a "natural behavioral response to spontaneously detecting a trained narcotic odor." (*Id.* at 20.) Maverick's alerts include "large head snaps back towards the odor of narcotics that he's been trained on, or he'll have quick little head snaps back and forth, all accompanied by deep rapid nasal breaths." (*Id.*) An "indication," the dog's trained response to the presence of the trained odors. Maverick makes a passive indication for the presence of narcotics, i.e., he sits, stands, lays down, or stares. (*Id.* at 21.) The indication signifies Maverick has "has pinpointed the strongest source that he can find." (*Id.*) Trooper Lippmann is trained that he must observe both an alert and an indication before determining the existence of probable cause based on Maverick's sniff. (*Id.* at 22.) Trooper Lippmann opined that Maverick accurately detects the odor of the trained narcotics. (*Id.* at 24.) Trooper Lippmann cannot identify whether, in the field, Maverick has failed to indicate when drugs were present. (*Id.* at 41.) This is because if he did not alert and indicate, no search was performed. Maverick has also alerted and indicated on occasions that no drugs were found. (*Id.* at 42.) Trooper Lippmann explained that in

these instances where there was an absence of contraband, "it was substantiated by the driver or whoever was in the vehicle that odor was present." (*Id.* at 62-63.)

On March 10, 2025, Trooper Lippmann attended a briefing regarding the planned vehicle "take down" and the anticipated free-air sniff. (*Id.* at 24.) He had not been involved in the prior investigation. (*Id.* at 57.) During the surveillance, Trooper Lippmann could hear the discussion among law enforcement officers about picking up the parcel, but he did not know where in the vehicle it was located. (*Id.* at 57-58.) Trooper Lippmann and Maverick arrived at the scene "within seconds" of the stop. (*Id.* at 24-25.) Before removing Maverick from his patrol vehicle, Trooper Lippmann did "a safety check of the vehicle to make sure there's no distractions or diversions in plain sight" and closed two doors on the driver's side of the 4Runner. (*Id.* at 25.) These doors appear to have been left open by the officers who stopped the vehicle. Maverick was placed on a leash with a flat collar.

Because there were multiple vehicles present, Trooper Lippmann had to direct Maverick to sniff the 4Runner. (*Id.* at 46.) Trooper Lippman gave Maverick a command to commence the free-air narcotics search and proceeded counterclockwise around the 4Runner. Trooper Lippmann's body-worn camera shows Maverick on a leash making two counterclockwise circles around the outside of the 4Runner. At points, Maverick would "rear up" and put his paws on the vehicle. This was not trained behavior, but a natural response. (*Id.* at 45.)

At 1:19 in Trooper Lippman's body camera video (i.e., 11:36:15), Maverick had completed his second lap around the 4Runner. (Gov. Ex. 3.) When asked, "So Maverick again goes down the passenger's side and didn't breathe heavy at the door seam or give any kind of alert at the passenger's door seam, correct?" Trooper Lippmann answered, "Correct." (Lippmann H'rg Test. at 48, Gov. Ex. 3. at 11:36:19.) Maverick was at the front of the vehicle when Trooper Lippman appeared to direct Maverick to reverse

directions and return to sniff the passenger side of the vehicle from front to back.[5] Trooper Lippmann testified he reversed directions to go into the wind to help detect odor. (Lippmann H'rg Test. at 48.)

Trooper Lippmann testified that Government Exhibit 3 at 11:36:27 shows a "head snap back and then went into the front passenger rear door seam, and then gave two small back and forth head snaps." (*Id.* at 26-27.) Trooper Lippmann identified these as alerts.

It appears that Maverick focused on the seam between the two passenger-side doors. (Gov. Ex. 3 at 11:36:26.) Trooper Lippmann verbalized, "an alert there" at 11:36:30. When Maverick reached the rear of the 4Runner, Trooper Lippmann again redirected Maverick along the passenger side of the 4Runner, this time from back to front. At 11:36:44 Maverick appeared to focus on and stop at the seam between the passenger side doors. This appears to have been an "indication" because Trooper Lippmann said, "Yes. Come on," and then praised Maverick. (*Id.* at 11:36:47.)[6] Trooper Lippmann narrated his observations at 11:37:20-11:38:02 which include the statement that Maverick made a "stand and stare indication." He testified that at that point Maverick had located the strongest source of the odor. (Lippmann Hr'g Test at 28.) Trooper Lippman testified that as a result of the search, four pounds of methamphetamine were located on the front passenger floorboard and user quantities were located in the middle row seats with a pipe. (*Id.* at 31.)

---

[5] Trooper Lippmann referred to this as "metering," that is, "Metering is when I – it's typically after I see an alert, and I will bring him -- swing him back around instead of -- like for, say, on the video, instead of continuing that pass all the way around the vehicle, I saw him alert several times on that passenger's side. I got to the back of the vehicle, and so I just rerouted him to come right back to where I saw that alert." (Lippmann H'rg Test. at 32-33.)

[6] Both parties questioned Trooper Lippmann about how Maverick was rewarded. Trooper Lippmann testified that he varies rewards to keep Maverick "accountable." While defense questioning touched on rewarding Maverick, distractions by other odors, and possible cueing, ultimately the record is too insubstantial on these issues to affect the credibility of Trooper Lippmann's testimony or the reliability of the sniff.

## C.    *Special Agent Mulnix's testimony*

Agent Mulnix was called to testify about the investigation at Defendant's detention hearing on October 25, 2025.  (Gov. Ex. 1.)  He testified consistently with the foregoing information from the warrant.  I have reviewed the transcript for additional details that bear on the issues at bar.  While additional relevant details are described below, facts not included in his affidavit will not be considered in determining if his affidavit established probable cause for the search.

Agent Mulnix is the Government's case agent.  (*Id.* at 4.)  The packages in question here came to his attention through his routine review of information about packages.  (*Id.* at 22.)  Of all the packages he was concerned with, only one was intercepted.  (*Id.* at 23.)  The intercepted package was the package discovered in the 4Runner following the March 10, 2025 traffic stop and K-9 sniff. (*Id.* at 23.)  Agent Mulnix could not say with certainty what was in any of packages that were not intercepted.  (*Id.*)

At some point, Agent Mulnix contacted Arizona Wholesale Flooring and spoke with the owner.  (*Id.* at 5-6.)  Agent Mulnix learned that Arizona Wholesale Flooring does not ship flooring supplies and did not ship packages to Iowa.  (*Id.* at 6.)  Agent Mulnix did not testify when this conversation took place, so it is difficult to determine how it may have informed the decision to stop the 4Runner.[7]

Agent Mulnix was personally involved in surveillance of the rural Delhi address. (*Id.* at 6, 25.)  Agent Mulnix interviewed J.A. and determined that J.A. was unaware of Defendant receiving packages at his house and that J.A. does not run a flooring company,

---

[7] The testimony at the detention hearing appropriately focused on the weight of the evidence against Defendant and other factors pertinent to detention, but the transcript is in many instances ambiguous for the purpose of ascertaining what investigators knew at the time the challenged evidence was seized and/or searched.  Hence my efforts to be particular about what evidence was clearly known to investigators at critical junctures.

and that J.A. never ordered anything from Arizona Wholesale Floors. (*Id.* at 8-9.) Again, this information is not Agent Mulnix's affidavit for the search warrant. J.A. was a friend of Defendant since they were in school. It is not clear that Agent Mulnix had this information when the 4Runner was stopped. On the contrary, it seems somewhat implausible investigators would have commenced questioning of J.A. before Defendant's arrest.

When packages were delivered to the rural Delhi address, they were picked up by Defendant or C.G. within less than 10 minutes of when Agent Mulnix thought they were expecting them. (*Id.* at 10.) Each of the packages was sent with a tracking number that permitted it to be tracked online and some of the packages were tracked. (*Id.* at 27-30.) An IP address associated with the account of Defendant's mother at Defendant's address in Delhi, Iowa was used to track at least one package. (*Id.* at 30.) However, it is not clear when Agent Mulnix learned this, and his search warrant affidavit does not mention tracking of packages.

On March 10, 2025, Defendant and C.G. parked where they could watch the mail delivery car pass by. (*Id.* at 11.) Law enforcement observed J.A. leaving the residence prior to delivery of the package on March 10, 2025. (*Id.* at 26.)

The search of the vehicle, pursuant to the warrant, revealed the parcel on the passenger floorboard where Defendant had been seated. Inside the parcel were Mason jars containing approximately two kilograms of pure methamphetamine. (*Id.* at 12.) The search of Defendant's person disclosed $5400 in cash and a cell phone. This cash did not include any pre-serialized money. (*Id.* at 24.)

The first date a delivery of a suspect package was subject to law enforcement surveillance was in March 2024. (*Id.* at 24-25.) Defendant was identified with video of the surveillance, consultation with local law enforcement officers familiar with

Defendant, and the registration of the 4Runner to Defendant's mother. (*Id.* at 25.) Defendant was not observed opening any packages. (*Id.*)

Agent Mulnix also discussed evidence that Defendant was sending packages to his suspected drug source and had conversations with that source about drug trafficking. Here, however, this information came from a cell phone seized during the traffic stop and there is no indication Agent Mulnix was aware of it prior to the stop. (*Id.* at 12-14.) Agent Mulnix investigated the transfer of money to Defendant's drug source; but here again, it is not clear if this information was known to any investigators prior to the traffic stop.

## III. DISCUSSION

### A. The Parties' Arguments

Defendant argues that the warrantless stop of the 4Runner was unconstitutional. Defendant argues that although he had been observed driving on a suspended license minutes before the stop, because he was no longer driving the 4Runner when it was pulled over, the "justification was stale and not supported by probable cause or reasonable suspicion." (Doc. 43-1 at 6-7.) After discussing authorities that he believes support his position, Defendant points to three factors which he argues show the stop was unreasonable:

> First, Mr. Harbach was no longer driving the vehicle when it was stopped. Second, officers first saw the traffic violation over one hour before effectuating the stop. Third, it is apparent that officers were waiting to see if the package would be retrieved before stopping the vehicle. Had the package not been retrieved, it is likely no stop would have taken place.

(*Id.* at 9.)

Next, Defendant asserts that the alert of the police service dog did not result in probable cause. Defendant asserts that Maverick's performance during the sniff and the training show any alleged alert was unreliable. Defendant's criticism of Maverick's

17

compliance with the training requirement relates to the length of time Maverick was actively engaged in training. In other words, Defendant contends, in essence, that if the applicable training requirement is 16 hours per month, it should consist of active training for that entire time. Defendant's challenge to the sniff itself is somewhat vague. His brief suggests some criticism of the fact Maverick did not alert on the first or second pass around of the 4Runner, but it is not entirely clear what he believes is objectionable about this procedure.

Defendant then contends that if the testimony regarding the police service dog alert is excised from the warrant application, it fails to establish probable cause. In support of this position, Defendant first argues that there is nothing inherently suspicious about a hand-addressed package label. Second, Defendant points out that is not known what was in the other packages sent from Arizona to the rural Delhi address. Third, information regarding the prior packages that were surveilled is "stale." Fourth, Defendant and C.G. had no prior drug-related arrests or convictions.

Defendant argues that the exclusionary rule should not apply because "the issuing magistrate wholly abandoned his judicial role," the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." (Doc. 43-1 at 15, quoting *United States v. Leon*, 468 U.S. 897, 923 (1984).)

Defendant argues, "Without the stale information (which should be excised) and the alleged PSD alert information (which should also be excised), the application only supports the conclusion that a package sent through the USPS would be found in the 4Runner." (*Id.*) Defendant does not explain why *Leon* requires excision of this information.

In response, the Government asserts that the traffic stop of Defendant for driving while his license was suspended was proper even though he was no longer driving. The Government cites a variety of Iowa and federal cases in support of its position that law enforcement need not have stopped Defendant *in flagrante delicto*. In the alternative, the Government contends that law enforcement's stop of the 4Runner was supported by probable cause from the drug trafficking investigation into the 18 packages sent from an Arizona flooring business to the rural Delhi address. (Doc. 48-1 at 12.)

Next, the Government contends Maverick's alert and indication supported probable cause to believe the 4Runner contained contraband or evidence of a crime. The Government asserts that it provided sufficient information regarding Maverick's training, certification, and alert on the 4Runner to support issuance of the search warrant.

The Government points to Maverick's certification and training records to counter Defendant's post-search challenge under *Florida v. Harris*, 568 U.S. 246-47 (2013). The Government contends these records show that Maverick was certified, reliable, and his training conformed with the standards adopted by the Iowa State Patrol. The Government argues that the search warrant application, having sufficiently described Maverick's certification and the sniff, should not have this information excised.

The Government argues that even if Maverick's search is unreliable and excised from the warrant application, the warrant still contains probable cause. Even if Maverick's sniff is unreliable, the Government contends the *Leon* exception applies[8]

---

[8] The Government addresses these last two arguments in the opposite order. (*See* Doc. 48-1 at 16, 20.)

**B.**     ***Whether the traffic stop based on Defendant's suspended license was***
***unconstitutional***

   *1.     Relevant law*

   The Fourth Amendment protects persons against unreasonable searches and
seizures.  U.S. Const. amend. IV.  Warrantless searches are per se unreasonable, with a
few well-established exceptions.  *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th
Cir. 2005).  "A law enforcement officer may conduct an investigative stop of a vehicle
when he [or she] has 'a particularized and objective basis for suspecting the particular
person stopped of criminal activity.'"  *United States v. Pounds*, 70 F.4th 1106, 1108 (8th
Cir. 2023) (quoting *United Sates v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also*
*United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) ("A police officer 'may,
consistent with the Fourth Amendment, conduct a brief, investigatory stop when the
officer has a reasonable, articulable suspicion that criminal activity is afoot.'") (Quoting
*Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  Courts consider the "totality of the
circumstances to determine whether an officer has a particularized and objective basis to
suspect wrongdoing."  *Pounds*, 70 F.4th at 1108 (citing *United States v. Arvizu*, 534
U.S. 266, 273 (2002)).  "When a team of law enforcement officers is involved in an
investigation, the issue is whether all the information known to the team provided
'specific and articulable facts which, taken together with rational inferences from those
facts, reasonably warrant' the investigative stop."  *United States v. Collins*, 883 F.3d
1029, 1032 (8th Cir. 2018) (per curiam) (quoting *United States v. Winters*, 491 F.3d 918,
921 (8th Cir. 2007), in turn quoting *United States v. Robinson*, 119 F.3d 663, 666 (8th
Cir. 1997)).

   Police are permitted to make an investigative stop of a vehicle if they have
reasonable suspicion that an individual in that vehicle recently committed a crime in a
general area. *See United States v. Roberts*, 787 F.3d 1204, 1209–10 (8th Cir. 2015)

(applying reasonable suspicion standard to stop of a vehicle several blocks from crime scene); *United States v. Juvenile TK*, 134 F.3d 899, 900–04 (8th Cir. 1998) (applying reasonable suspicion standard for traffic stop where officers received two dispatch messages within forty-five minutes informing them that a vehicle had been involved in criminal activity in the area).

### 2. Analysis

Here, Defendant does not claim that law enforcement never witnessed him driving without a license. The 4Runner can be seen on the video arriving at the rural Delhi house. Defendant does not deny that he and C.G. changed places in the 4Runner. Nor does he claim that law enforcement had no reason to believe his license was suspended. Instead, he asserts that the justification was stale after C.G. took the wheel and the vehicle in which he was a passenger was stopped a few minutes later. The legal justification Defendant relies upon is very thin. In *United States v. Copeland* the government introduced evidence recovered from the a vehicle following a traffic stop for illegal parking. 321 F.3d 582, 589 (6th Cir. 2003). In *Copeland* officers intended to issue a citation for parking on the wrong side of the road at a 45-degree angle, but the car drove away, and officers followed for about a mile before the stop was effected. The Sixth Circuit Court of Appeals held:

> The district court found that a parking violation, by itself, does not constitute adequate grounds to stop a vehicle because it is not a traffic violation. *See Hartwell,* 67 F.Supp.2d at 790. We disagree. The placement of the defendants' vehicle at a 45–degree angle to the curb, facing the wrong direction, clearly violates Michigan's parking regulations. *See* Mich. Comp. L. § 257.675(1) ("[A] vehicle stopped or parked upon a highway or street shall be stopped or parked with the wheels of the vehicle parallel to the roadway and within 12 inches of any curb existing at the right of the vehicle."). This parking regulation is set forth under the general traffic laws of the Michigan Vehicle Code. *See* Mich. Comp. L. § 257, Ch. IV, Obedience To And Effect Of Traffic Laws. Moreover, the Michigan Vehicle Code provides that officers may enforce any of the regulations

subsumed in this section by virtue of a stop. *See* Mich. Comp. L. § 257.742(1) ("A police officer who witnesses a person violating this act or a local ordinance substantially corresponding to this act . . . may stop the person, detain the person temporarily for purposes of making a record of vehicle check. . . ."). It is clear, then, that an officer can effect a stop based upon a driver's failure to comply with Michigan's parking regulations, even if the vehicle is no longer parked. Thus, an antecedent parking violation can conceivably form the basis for probable cause to stop a vehicle.

However, our inquiry does not end here. Although an officer may effect a stop of a vehicle for parking illegally, that stop is nonetheless subject to the general reasonableness requirements of *Whren*. In particular, where an officer is in possession of information that creates the basis for probable cause, he is required to act upon this information within a reasonable period of time—otherwise the existence of probable cause is said to have become stale. *See United States v. Henson,* 848 F.2d 1374, 1382 (6th Cir.1988). Whether the facts creating the basis for probable cause have become stale is directly related to the nature of those facts. *Id.* ("In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime[.]") (quoting *United States v. Haimowitz,* 706 F.2d 1549, 1554–55 (11th Cir.1983)); *see also United States v. Akram,* 165 F.3d 452, 456 (6th Cir.1999) ("To determine whether evidence establishing probable cause is 'stale,' we consider the inherent nature of the suspected crime. . . ."). Logically, where an observed parking violation is not ongoing, an officer is required to effect a stop based upon this conduct within a reasonable period of time. Because a parking violation necessarily takes place only when a vehicle is stopped or standing, the time in which a moving vehicle can reasonably be stopped for a parking violation is relatively limited.

Under this framework, we conclude that the stop of the defendants one mile from their parked location was reasonable. Upon observing the defendants illegally parked, both officers testified that they immediately circled the block to further investigate. Furthermore, even though the officers did not immediately stop the defendants as they began their pursuit, the officers explained that a third car had entered the road between the defendants' vehicle and the patrol car. Once this third vehicle turned off the road, the officers testified that they activated their patrol lights and stopped the defendants. Given the circumstances surrounding this stop, including the

22

presence of a third vehicle and the relatively short distance in which the officers followed the defendants prior to conducting the stop, we find that the stop of the vehicle was reasonable. Therefore, the evidence recovered by the officers in the course of this stop was properly admitted into evidence.

*Copeland*, 321 F.3d at 594–95. Thus, the facts of *Copeland* suggest that law enforcement's stop of Defendant herein was reasonable. In other words, as in *Copeland,* law enforcement observed the infraction and, although the illegal conduct had ceased when Defendant stopped the car and allowed C.G. to drive, law enforcement stopped him within only a few minutes.

Focusing on the concept of staleness, Defendant relies on *United States v. Zuniga*, 860 F.3d 276 (5th Cir. 2017). In *Zuniga* the defendant's vehicle was stopped some 15 minutes after officers observed a turn-signal violation and possibly a parking infraction. In *Zuniga*, the Fifth Circuit Court of Appeals reasoned:

> The record indicates that the turn-signal offense occurred and was immediately relayed; yet, the call went unanswered by fellow officers. In fact, Zuniga was not stopped for this violation until approximately fifteen minutes after it was observed. But other factors provide support for the Government's argument that the stop was reasonable. Notably, Zuniga does not dispute that Detective Chavarria and other agents observed his vehicle fail to signal continuously for at least 100 feet before turning. Nor does Zuniga dispute that Detective Chavarria radioed information about the turn-signal violation to his colleagues as soon as he saw it occur, although none of the other officers were in position to stop the vehicle at the time. Thus, in following the *Copeland* court's lead in considering the "circumstances surrounding the stop," 321 F.3d at 595, we hold that the totality of the circumstances do not dictate a finding that the turn-signal violation was too stale to justify stopping the vehicle. That is to say, the delay here is not enough to negate the violation as grounds for the later stop.
>
> We make no attempt to articulate a *specific* time limitation to which officers must adhere in effecting a stop following a traffic violation. Rather, we

stress that, consistent with our holdings in similar contexts, stops following transportation violations must be reasonable in light of the circumstances. *See, e.g.*, *United States v. Robinson*, 741 F.3d 588, 598 (5th Cir. 2014) (emphasizing that "[s]tale information cannot be used to establish probable cause"). To reiterate, we hold only that the elapsed time between an observed violation and any subsequent stop must be reasonable upon consideration of the totality of the circumstances.

*Zuniga*, 860 F.3d at 282.

In the case at bar, the Government relies on *State v. Christopher,* 757 N.W.2d (Iowa 2008). In *Christopher*, an off-duty police officer observed a car in front of him strike a curb. The off-duty officer pulled alongside the vehicle and recognized the driver. The off-duty officer yelled at the defendant through the passenger window and asked whether he should be driving. The defendant responded that he had a driver's license and drove off. 757 N.W.2d at 248. The next day, the off-duty officer checked the defendant's driving status and learned that the defendant was barred from driving. *Id*. "Instead of filing a police report or obtaining an arrest warrant, Butler decided he would simply arrest Christopher the next time he saw him." *Id*. Five weeks later the officer was on duty and saw the defendant sitting steps in front of a house. The officer arrested the defendant for driving while barred and searched the defendant, finding marijuana and crack cocaine in the defendant's pants pockets. *Id*. The defendant was charged with drug possession and driving while barred offenses. The defendant moved to suppress the drug evidence, which the district court denied. *Id.* at 249.

Among other things, the defendant argued that "a warrantless arrest is lawful only if the officer arrests the individual within a reasonable amount of time after the officer observes the individual committing the offense" and because the officer "had time to obtain an arrest warrant, [the defendant] claims his warrantless arrest was unlawful." *Id*.

24

at 249-50. The Iowa Supreme Court was unpersuaded by the defendant's argument and explained that:

> [W]hether the police officer had time to obtain an arrest warrant is irrelevant under the Fourth Amendment. *United States v. Watson*, 423 U.S. 411, 423–24, 96 S.Ct. 820, 828, 46 L.Ed.2d 598, 609 (1976). The proper inquiry is whether the officer had probable cause to arrest: "[a] warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 799, 157 L.Ed.2d 769, 774 (2003). . . . A reasonable time requirement between the time the officer observed the offense and the warrantless arrest would require a case-by-case determination. *See Watson*, 423 U.S. at 423–24, 96 S.Ct. at 828, 46 L.Ed.2d at 609. We do not find such a determination necessary to protect the rights of the accused. The primary purpose of an arrest "is to bring a suspect before a magistrate to answer a charge." *United States v. Moore*, 215 F.3d 681, 685 (7th Cir.2000). [The defendant's] constitutional rights are adequately protected by the requirement that he be taken "without unnecessary delay" to the "nearest or most accessible magistrate." Iowa Code § 804.22. . . .
>
> [The defendant] does not deny the existence of probable cause to arrest him for driving while barred. *See Freeman*, 705 N.W.2d at 298 (stating probable cause exists "'if the totality of the circumstances as viewed by a reasonable and prudent person would lead that person to believe that a crime has been or is being committed and that the arrestee committed or is committing it'" (quoting *State v. Bumpus*, 459 N.W.2d 619, 624 (Iowa 1990))). Instead, he focuses on several state court decisions interpreting warrantless arrest statutes to preclude any delay between witnessing the offense and the arrest. *See*, *e.g.*, *Smith v. State*, 228 Miss. 476, 87 So.2d 917 (1956); *Oleson v. Pincock*, 68 Utah 507, 251 P. 23 (1926). However, none of these cases are based on constitutional grounds. Moreover, our own statute does not require a warrantless arrest be made with reasonable promptness after the offense has been committed in the officer's presence. *See* Iowa Code § 804.7(1) (allowing an officer to make an arrest with or without a warrant "[f]or a public offense committed or attempted in the peace officer's presence"). Under our rules of statutory construction, we are obligated to apply the law as written. *In re Name Change of Reindl*,

671 N.W.2d 466, 469 (Iowa 2003). "We may not, under the guise of judicial construction, add modifying words to a statute or change its terms absent 'inadvertent clerical errors or omissions which frustrate the obvious legislative intent.'" *City of Asbury v. Iowa City Dev. Bd.*, 723 N.W.2d 188, 197 (Iowa 2006) (quoting *Schultze v. Landmark Hotel Corp.*, 463 N.W.2d 47, 49 (Iowa 1990)). There is nothing to suggest the legislature intended to restrict the authority of an officer making a warrantless arrest to a limited time frame.

*Id*. at 250.

First, as *State v. Christopher* makes clear, the fact that Defendant was no longer driving is of little consequence. Defendant cites no authority for the proposition that he must be apprehended in the act. Next, Defendant claims the stop was stale because he had been *first* seen driving when he was known to have a suspended license more than an hour before the stop. Defendant cites no authority for the proposition that staleness should be measured from the first observation of the illegality rather than the most recent. As it pertains to staleness, I reject this proposition as nonsensical. Indeed, in *United States v. Sandridge*, 385 F.3d 1032 (6th Cir. 2004), a police officer observed the defendant driving a yellow Cadillac and ran license check and learned that the defendant did not have a valid driver's license. *Id*. at 1033-34. Three weeks later, the officer observed the defendant driving the same vehicle and conducted a traffic stop. *Id*. at 1033-35. The defendant argued that "the March 5 license check was too 'stale' to be relied on by [the officer] three weeks later, on March 27, 2002, when he pulled [the defendant] over on the traffic stop." *Id*. at 1035. The Sixth Circuit was unpersuaded by the defendant's argument, reasoning that:

> When a police officer conducts a brief investigatory stop of a person in a vehicle, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." [*United States v. Ridge*, 329 F.3d 535, 540 (6th Cir. 2003)] (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). When [the officer] observed [the defendant] driving

26

on March 27, 2002, he reasonably suspected that he was driving without a valid license because, just three weeks earlier, on March 5, 2002, [the officer] ran a license check on [the defendant's] car and learned that he did not have a valid license. . . .

[The defendant] also argues that . . . any reasonable suspicion stemming from the March 5 license check was "stale" by the next time [the officer] saw [the defendant] driving again, on March 27, 2002. We reject that argument. In situations where the criminal activity is of an ongoing nature, it will take longer for the information to become stale. *See United States v. Greene*, 250 F.3d 471, 480 (6th Cir.2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."). Driving without a valid license is a continuing offense—in contrast, say, to a speeding or parking violation—and there are no facts in the record suggesting that [the officer] should have assumed that [the defendant's] ongoing offense had ceased between March 5 and March 27, 2002. Accordingly, [the officer] had a reasonable basis for suspecting that [the defendant] still lacked a valid license on March 27 and, therefore, [the officer] was permitted to stop [the defendant] briefly to determine whether the crime was still being committed. *See United States v. Mans*, 999 F.2d 966, 968 (6th Cir.1993) (holding that an officer's stop of a defendant was reasonable, and not pretextual, where the officer recognized the defendant from prior arrests and knew that his driver's license had been revoked).

*Id.* at 1036. Had Defendant been arguing law enforcement waived the right to stop him or that he relied on law enforcement forbearance (note: he is not arguing either and there's no reason to), it might make sense to measure the length of time that law enforcement witnessed the conduct before stopping him. Here, however, he was last seen driving the vehicle about two minutes before the stop.

In *United States v. Kinney*, No. 4:21 CR 600 RLW (SRW), 2023 WL 3903674 (E.D. Mo. May 22, 2023), officers observed a vehicle speeding and using the center lane to pass cars on either side of the vehicle. *Id.* at *2. The vehicle turned onto a different road and slowed down to a normal rate of speed. *Id.* Officers deployed a spike strip to stop the vehicle. *Id.* The district court determined that the officers had probable cause

to stop the vehicle based on the traffic violations—speeding and using the center turn lane to pass other vehicles. *Id.* at *3. The district court stated, "[t]he fact that at the time of the stop, Defendant was no longer driving over the speed limit or using the center turn lane as a passing lane does not negate the officers' probable cause. A short delay between the alleged traffic violation and the traffic stop is permissible." *Id.* at *4 (citing *United States v. Zuniga*, 860 F.3d 276, 282 (5th Cir. 2017) (determining that a traffic stop 15 minutes after the traffic violation was permissible), *United States v. Anderson*, 458 Fed. App'x 440, 442-43 (6th Cir. 2012) (determining that short delay between an officer noticing the violation and initiating the stop is permissible)). Nothing about this circumstance makes the stop stale.

Third, it is of no consequence "that officers were waiting to see if the package would be retrieved before stopping the vehicle. Had the package not been retrieved, it is likely no stop would have taken place." (Doc. 43-1 at 9.) *See United States v. Rederick*, 65 F.4th 961, 965 (8th Cir. 2023) (providing that a law enforcement officer's "motivation for the stop is irrelevant"), citing *Whren v. United States*, 517 U.S. 806, 813 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"), in turn citing *United States v. Robinson*, 414 U.S. 218, 221 n. 1 (1973) (determining that a traffic violation arrest was not rendered invalid by the fact it was "mere pretext for a narcotics search")); *see also United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016) (providing that an officer's "observation of the traffic violation . . . gave him probable cause to stop the vehicle, and his subjective intent to detain the vehicle for a dog-sniff search is irrelevant"). Defendant's speculation that he would not have been stopped but for having collected the parcel from the rural Delhi is likely accurate, but immaterial. I agree it would seem unusual for drug enforcement agents to make a traffic stop of a suspected drug trafficker merely to cite him for driving with a suspended

license.  However, the underlying reason for the stop (i.e., to investigate drug trafficking) simply does not matter if law enforcement also had a legitimate basis to stop him for a traffic offense.

Defendant also points out that Defendant had neither any drug-related arrests nor criminal history.  (Doc. 43-1 at 14.)  While this fact weighs somewhat against a finding probable cause, by itself it does not overcome the other evidence in the record supporting the existence of probable cause for the stop and search.

For these reasons, I recommend the Court deny Defendant's motion to the extent it relies on an unconstitutional traffic stop.  If the Court disagrees with me, its analysis of should continue by examining the basis for the stop based on the suspected drug trafficking.

## C.  *Whether the drug investigation created a basis to stop and/or search the 4Runner*

The parties approach this issue somewhat differently, but ultimately they both address whether the drug trafficking investigation *by itself* gave law enforcement grounds to stop and/or search the vehicle.  Defendant does not directly assert that the drug investigation was insufficient to establish probable cause for the stop.  Rather, Defendant asserts that if the dog sniff is unreliable, then the remainder of the affidavit (in essence the drug trafficking investigation) does not support probable cause for the search of the vehicle.  (Doc. 43-1 at 12-16.)  In contrast, the Government argues that the alternative basis for stopping the 4Runner was law enforcement's reasonable suspicion that Defendant was involved in drug trafficking.  (Doc. 48-1 at 12).  The Government also contends that the warrant is supported by probable cause, even in the police service dog's alert/indication are excised.   (Doc. 48-1 at 20.)

As I acknowledge below, it is not the Court's role to second guess the issuing judge's determination of probable cause, if it is based on substantial evidence.  Here,

however, the Court is looking at the evidence in the record (which, in this case, is principally the facts in the warrant affidavit) to determine what law enforcement knew at the time of the stop. Thus, I am not attempting to second guess the issuing judge when I look to the affidavit to determine what law enforcement knew at the relevant time.

### 1.     *Relevant law*

As discussed above, "[a] law enforcement officer may conduct an investigative stop of a vehicle when he [or she] has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Pounds*, 70 F.4th 1106, 1108 (8th Cir. 2023) (quoting *United Sates v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) ("A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'") (Quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Courts consider the "totality of the circumstances to determine whether an officer has a particularized and objective basis to suspect wrongdoing." *Pounds*, 70 F.4th at 1108 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

"Police are permitted to make investigative stops of a vehicle if they have reasonable suspicion that an individual in that vehicle recently committed a crime in a general area." *United States v. Martin*, 15 F.4th 878, 880 (8th Cir. 2021). "A reasonable suspicion is a 'particularized and objective' basis for suspecting the person who is stopped." *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005). "Under *Terry* [v. Ohio, 392 U.S. 1 (1968)], 'the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007) (quoting *United States v. Sokolow*, 490 U.S. 1 (1989)).

"When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (per curiam) (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007), in turn quoting *United States v. Robinson*, 119 F.3d 663, 666 (8th Cir. 1997)).

Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). However, courts have long recognized the "automobile exception" to the Fourth Amendment. *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003); *see generally Carroll v. United States*, 267 U.S. 132, 158-59 (1925). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Kennedy*, 427 F.3d at 1140-41 (citations omitted); *see also United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) ("Although a warrantless search usually constitutes a per se Fourth Amendment violation, the automobile exception to the Fourth Amendment's warrant requirement permits the warrantless search or seizure of a vehicle by officers possessing probable cause to do so"); *United States v. Schackleford*, 830 F.3d 751, 753 (8th Cir. 2016) ("Probable cause to believe that an automobile contains contraband or evidence of criminal activity as long been held to justify a warrantless search of the automobile and seizure of the contraband."). The burden is on the Government to justify warrantless searches. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d at 287-88.

"Probable cause for the stop and search of this vehicle may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information within knowledge of the officer(s) on the scene if there is some degree of communication." *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017) (citing *United States v. Shackleford*, 830 F.3d 751, 753-54 (8th Cir. 2016)). Further, "[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Rederick*, 65 F.4th 961, 966 (8th Cir. 2023) (quoting *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008)); *see also United States v. Jacobsen*, 391 F.3d 904, 907 (8th Cir. 2004) ("The patrol officer himself need not know the specific facts that caused the stop . . . [r]ather, the officer need only rely upon an order that is founded on reasonable suspicion.").

### 2.   *Analysis*

To be clear, at this stage the Court is not called upon to determine whether the warrant contains probable cause, but rather to determine if there was probable cause or

reasonable suspicion to stop the 4Runner before the warrant was obtained. However, because it is unclear when Agent Mulnix learned certain facts about the investigation, his affidavit in support of the warrant may be the best place to ascertain what facts were known to law enforcement about the alleged drug trafficking before the stop. The 4Runner was stopped at approximately 11:30 a.m. on March 10, 2025. (Def. Ex. C.) The warrant application was submitted at 1:43 p.m. the same day. (Gov. Ex. 2 at 1.) It is reasonable to conclude that the following was known to law enforcement at the time the 4Runner was stopped. I have ~~stricken~~ portions of the affidavit that seem derived from post-stop investigation or about which I am uncertain:

## Background

1) I [Joshua Mulnix] am a Special Agent with the Iowa Department of Public Safety, Division of Narcotics Enforcement (hereinafter, "DNE") and a sworn peace officer in the state of Iowa. I am also a Task Force Officer with the United States Postal Inspection Service.

2) I completed the Iowa Department of Public Safety's (hereinafter, "DPS") 29th Basic Academy, graduating on May 20, 2005. . . .

. . .

## Probable Cause

5) This affidavit is made in support of an application for a search warrant for a dark gray 2008 Toyota 4Runner, with VIN number JTEBT14R58K005186, bearing Iowa registration plate LTL 397, hereinafter the "Subject Vehicle." The Subject Vehicle is registered to [R.J.S], of XXX Gay Street, Delhi, Iowa 52223. ~~The Subject vehicle is currently located at the Delaware County Sheriff's Office, located at 1225 W Howard Street, Manchester, Iowa, and is under the control of the DNE and the Delaware County Sheriff's Office.~~ The Subject Vehicle is believed to contain controlled substance(s) as well as additional evidence pertaining to the receiving, distribution, and possible use of controlled substances, which evidence includes cellular telephones, United States currency, packaging/parcels utilized to send/receive controlled substance(s) through

33

parcel delivery services, documents/records pertaining to payment for controlled substances received, and/or documents relating to the distribution of controlled substances through the United States mail or other parcel delivery services.

**[Investigation of Packages]**

6) During the course of this investigation, I have conducted reviews of United States Postal Service (hereinafter "USPS") business records and other information pertaining to the investigation of suspected drug parcels being sent through the USPS to [XXXX] Pioneer Road, Delhi, Iowa 52223. USPS business records document that between approximately May of 2023 and November of 2024, a total of eighteen (18) parcels addressed to [XXXX] Pioneer Road, Delhi, IA 52223 have been submitted to USPS in Arizona. All of those parcels have been paid for in cash.

7) I was not able to find USPS business records identifying the recipient name or return addresses pertaining to every one of the parcels mailed from Arizona to [XXXX] Pioneer Road, however, I was able to review images of some of those parcels generated by USPS sorting equipment. Of the images of six (6) parcels I was able to review, all of them showed the respective parcels bore the hand-written recipient name, "All Hands Complete Floor Care LLC," (or a close variant, for example, excluding LLC). Five of the parcels bore the hand-written return address "Arizona Wholesale Floors, 124 S. Ironwood Dr. # 2, Apache Junction, AZ 85120." One of the parcels bore the hand-written return address "Country Club Flooring, 1740 S Country Club Dr., Mesa, AZ 85210."

8) I checked Google Maps and observed Google Maps listed [XXXX] Pioneer Road, Delhi, Iowa as the address for All Hands Complete Floor Care LLC. I viewed a Facebook Page for All Hands Complete Floor Care LLC and observed a posting on that page which displayed a picture of a carpet cleaning certificate issued to [J.A.] I reviewed Iowa driver's license and vehicle registration information for [J.A.] which showed he listed his residence as [XXXX] Pioneer Road, Delhi, IA 52223. During the course of this investigation officers have observed a male subject, consistent in appearance with [J.A.] on the property at [XXXX] Pioneer Road.

9) I conducted an open source internet search for Arizona Wholesale Floors, 124 S. Ironwood Dr. # 2, Apache Junction, AZ 85120, and observed the website https://www.arizonawholesalefloors.com. The aforementioned website purported to be the website for Arizona Wholesale Floors and listed the business address as 124 S. Ironwood Dr. # 2, Apache Junction, AZ 85120. Google listed additional websites that also showed the aforementioned address as the location for Arizona Wholesale Floors.

10) I conducted an open source internet search for "Country Club Flooring, 1740 S Country Club Dr., Mesa, AZ", and observed search result which showed multiple websites listed that address as a location for The Home Depot. I observed a page of the www.homedepot.com website which listed 1740 S Country Club Dr., Mesa, AZ 85210 as the location for Home Depot store "Mesa #469."

11) Based on my training and experience, as well as the information identified, reviewed, and documented in this investigation, I believe All Hands Complete Floor Care LLC, Arizona Wholesale Floors, and Country Club Flooring are/were being utilized as names and addresses on suspected drug parcels sent to [J.A.'s] residence in order to make the parcels appear to be legitimate business mail. I recognized various characteristics of the above-detailed parcels were not consistent with typical business mail, such as the parcels being hand-labeled, paid for in cash, and the various parcels being submitted to USPS from multiple cities which sometimes differed from the city listed in the return address.

12) The parcel bearing the return address of 1740 Country Club Dr., assigned USPS tracking number 420522239505512374785065628644 (hereafter referred to as the "Subject Parcel"), showed Mesa, AZ as the city in the return address, however, USPS records documented the Subject Parcel was submitted to the mail stream in neighboring Gilbert, AZ.

13) Further indications that the above-detailed USPS parcels contained controlled substance were observed during surveillance operations conducted by law enforcement on November 04, 2024 and March 13, 2024.[9] Law enforcement officers conducted surveillance of the regular

---

[9] Based on Agent Mulnix's testimony (Gov. Ex. 1 at 6) and his report (Def. Ex. A), it seems the correct date is March 14, 2024.

USPS delivery of two (2) parcels (one parcel on each of the aforementioned dates) addressed to "All Hands Complete Floor Care LLC, [XXXX] Pioneer Rd., Delhi, IA 52223," with the return address "Arizona Wholesale Floors,124 S. Ironwood Dr. # 2, Apache Junction, AZ 85120." On both occasions, shortly after the delivery the respective parcel to [XXXX] Pioneer Rd., a subject whom officers video-recorded and visually identified as consistent in appearance with JESSE HARBACH, appeared to leave the residence with the parcels and transport them to a different location(s), within minutes of the parcels' respective deliveries by USPS. HARBACH immediately taking and moving the respective parcels indicated to officers that [J.A.] was not intended to be the final recipient of the parcels, despite the parcels being regularly sent to [J.A.'s] residence.

14) On multiple occasions throughout this investigation I have checked Iowa Driver's License information pertaining to JESSE HARBACH. Information for his Driver's License with an issue date of March 05, 2015, as well as with the update issue date of February 07, 2025 both list HARBACH'S residential address as [XXX] Gay Street, Delhi, Iowa and his mailing address as P.O. Box 303 Delhi, Iowa 52223. This indicates to me that HARBACH has formally listed addresses for receiving legitimate legal mail addressed to him. HARBACH obtaining mail items from an address that does not appear to be directly associated with him is consistent with someone receiving illegal substances through the mail.

15) I reviewed driver's license and criminal history pertaining to JESSE HARBACH. I observed HARBACH had criminal convictions in Iowa and Arizona, as well as driver's license information from Iowa and Arizona. I observed expired Arizona driver's license information for HARBACH which listed his address (historical) as1233 E Sea Breeze Dr., Gilbert, AZ 85234. While I could not definitively know that [J.A.] had no connection to Arizona, based on the driver's license, criminal history and open source records I reviewed pertaining to [J.A.], I did not see any information indicating [J.A.] had traveled to or lived in Arizona. Based on my training and experience I know Arizona is a major source state for controlled substances shipped to other states.

**[March 10, 2025 Surveillance and Stop]**

16) On the morning of March 10, 2025 law enforcement officers conducted

36

surveillance on the regular USPS delivery of the Subject Parcel to the residence at [XXXX] Pioneer Road, Delhi, Iowa. At approximately 9:56 a.m. officers observed the Subject Vehicle, operated by a female who was later confirmed to be [C.G.], stop at the residence. [C.G.] exited the Subject Vehicle, approached the residence, then departed shortly thereafter. Officers observed the Subject Vehicle drive to [XXX] Gay Street, Delhi, where a male subject, subsequently confirmed to be HARBACH, entered the vehicle. Officers observed the Subject Vehicle returned to [XXXX] Pioneer Road at approximately 10:12 a.m., at which time HARBACH and [C.G.] entered the residence. At approximately 10:20 a.m. officers observed HARBACH and [C.G.] depart from [XXXX] Pioneer Road in the Subject Vehicle, with HARBACH driving.

17) At approximately 11:18 a.m. officers observed a USPS mail carrier deliver a parcel to the front of porch of the residence at [XXXX] Pioneer Road. USPS business records confirmed the Subject Parcel was delivered to the residence at that time. At approximately 11:24 a.m. officer observed the Subject Vehicle arrive at [XXXX] Pioneer Road and park near the house. Officers observed HARBACH exit the driver's side of the Subject Vehicle and enter the front passenger door. Officers observed [C.G.] retrieve the Subject Parcel form the residence at [XXXX] Pioneer Road and enter the Subject Vehicle with it. At approximately 11:26 a.m. officers observed the Subject Vehicle leave [XXXX] Pioneer Rd driving North.

18) At approximately 11:27 a.m. officers initiated a traffic stop on the Subject Vehicle. Officers conducting surveillance were aware that HARBACH'S Iowa Driver's license was suspended with 3 withdrawls in effect. HARBACH was arrested and charged for driving while suspended, based on officers' observations leading up to that time. HARBACH had a cellular phone and a stack of United States currency on his person when he was taken into custody. HARBACH'S cell phone and currency were held by law enforcement pending further investigation and this search warrant application.

19) At approximately 11:35 a.m., Trooper John Lippmann, of the ISP, deployed his Police Service Dog (PSD), Maverick, to conduct a free air sniff around the Subject Vehicle. PSD Maverick is a certified narcotics detection dog through Nebraska State Standard. Trooper Lippmann has been working with Maverick since September 2021. Maverick is certified

37

in the detection of the odors of marijuana, methamphetamine, cocaine, and heroin. Maverick was most recently recertified in November 2024.

20) Trooper Lippmann advised that Maverick had indicated to the presence of the odor associated with illegal narcotics during the sniff around the Subject Vehicle at approximately 11:36 a.m.

21) During the course of the traffic stop on the Subject Vehicle, officers observed, in plain sight, through the window, a parcel that appeared to be the Subject Parcel situated on the passenger floorboard. The Subject Vehicle was towed to the Delaware County Sheriff's Office under the supervision of law enforcement. The Subject Vehicle is currently under the control of DNE and the Delaware County Sheriff's Office at that location, in order to keep it secured during the process of this search warrant application.

22) [C.G.] was released from the scene of the traffic stop and transported to a residence of her request in Delhi by officers. [C.G.] stated a cell phone belonging to her was inside the Subject Vehicle. [C.G.] was not allowed to remove anything from the vehicle and this warrant seeks authority to seize cellular phones and cash belonging to [C.G.] and HARBACH, including the phone and cash seized from HARBACH'S person and any cellular phones and/or cash inside the Subject Vehicle.

(Gov. Ex. 2.)

In addition to the foregoing, the affidavit included statements regarding Special Agent Mulnix's training and experience that are relevant to the basis for the stop:

23) Based on my training and experience, I know people involved with the distribution of controlled substances commonly utilize vehicles to transport themselves to conduct both legal and illegal activities. Those illegal activities often include concealing, transporting and distributing controlled substances. I also know that people involved with the distribution of controlled substances commonly transport other evidence of distribution, including U.S. Currency which are proceeds from distribution of controlled substances, receipts pertaining to transfer(s) of money as payment for controlled substances, receipts which are evidence of travel pertaining to their distribution activities, and cellular phones which contain evidence pertaining to arrangements and confirmation of illegal transactions.

38

. . .

> That drug traffickers commonly store firearms, drugs, money, drug paraphernalia at places other than homes such as storage facilities, cars, and "stash" houses where large amounts of drugs and or cash may be possessed and easily accessible.

Here, I conclude there was reasonable suspicion to stop and probable cause to search the 4Runner based on the foregoing information regarding suspected drug trafficking. Law enforcement had discovered 18 suspicious packages being delivered to the rural Delhi address. Multiple circumstances made the deliveries suspicious. First, details about the packages themselves: 1) a business paying for shipping in cash; 2) business-to-business shipping utilizing hand-written recipient and return addresses; 3) an apparently fictious sender (Country Club Flooring) with a return address that was actually a Home Depot; 4) the submission of parcels from multiple cities inconsistent with the purported return address; and 5) the shipping of parcels over an extended time period, i.e. May 2023 to November 2024.

Second, Defendant's interaction with the packages was also suspicious. On three occasions (including the March 10 delivery) Defendant was observed collecting the parcels shortly after their delivery to the rural Delhi address where he did not reside. In other words, rather than have the parcels delivered to his own residence in Delhi itself, Defendant drove out to obtain the parcels addressed to a floor care company. This collection occurred within minutes of their delivery. This made law enforcement believe J.A. was not the intended recipient of the parcels. Defendant displayed eagerness to collect the parcel on March 10, 2024 prior to the traffic stop. On this occasion, C.G. had driven to the rural Delhi residence once and Defendant went with her again prior to the ultimate delivery of the package. (Gov. Ex. 2 at Paragraph 16.) Defendant ultimately

collected the package on the third try that morning at 11:24 a.m., that is, 6 minutes after it was delivered by USPS.

Defendant attempts to minimize the nature and scope of the investigation when he states, "While it may be somewhat unusual for a package purportedly sent by a business to have a handwritten address label, this does not automatically make the package incriminating in nature. This is especially true in today's age when there are countless small businesses sending packages through the mail via orders on sites like Etsy." (Doc. 43-1 at 14.) The foregoing investigation shows multiple packages over more than a year being addressed and received under suspicious circumstances consistent with the drug trade. Therefore, I conclude law enforcement had reasonable suspicion and probable cause to stop and search the 4Runner. *See Kennedy*, 427 F.3d at 1140-41 ("The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime") (citations omitted); *Schackleford*, 830 F.3d at 753 ("Probable cause to believe that an automobile contains contraband or evidence of criminal activity as long been held to justify a warrantless search of the automobile and seizure of the contraband.").

For these reasons, I recommend the Court deny Defendant's motion to the extent it relies on an allegedly unconstitutional stop in furtherance of the drug trafficking investigation. If the Court concludes the stop and search was justified by the drug trafficking investigation, it may conclude its analysis by finding the search was justified by the automobile exception. *See Kennedy*, 427 F.3d at 1140-41. On the other hand, the Court may choose whether the search was justified, as discussed below, by the open-air sniff, the warrant, and/or the *Leon* exception.

40

**D.      Whether Police Service Dog's sniff resulted in probable cause**

**1.      Relevant law**

A dog sniff of the exterior of a vehicle during a stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)). "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010); *see also United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014) (providing that "the handling officer testified [his dog] gave two definitive 'alerts' to the side of [the defendant's] truck" and "[a]s a result, we are not concerned about [the dog's] failure to give a full indication"); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (holding that the positive indication of a reliable drug dog, alone, is enough to establish probable cause). A drug dog is considered reliable when it has been "trained and certified to detect drugs and a detailed account of the dog's track record or education is unnecessary." *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (citation omitted). In explaining what is necessary to prove a dog's reliability the Supreme Court stated:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Florida v. Harris*, 568 U.S. 237, 246-47 (2013). The standard to establish probable cause "is no more demanding where police search an automobile based on probable cause without a warrant." *Olivera-Mendez*, 484 F.3d at 512. However, the court must also

41

consider evidence that may detract from the dog's reliability. *See Winters*, 600 F.3d at 967 ("Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the credibility of the dog.'") (Quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). The relevant question is "whether all the facts surrounding a dog's alert [or indication], viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

### 2. *Analysis*

Here, Trooper Lippmann's determination there had been an alert and indication by his police service dog supports probable cause for the search. Defendant's efforts to undermine the credibility of the Maverick's alert/indication are principally focused on the amount of time he was actively involved in training. I also questioned Trooper Lippmann about the fact that dogs are not engaged in active sniffing the entire 16 hours of training. Trooper Lippmann testified that no one has ever suggested that the training is supposed to consist of 16 hours of active sniffing. While I understand the criticism by the defense, I do not find any of the suggested bases to challenge the sniff to be particularly persuasive. How much "active" training per month is necessary or desirable to attain and maintain certification may be open to debate among those who set such standards. According to Trooper Lippmann, multiple hours of straight training would be "a heavy payload" for a dog. (Lippmann Hr'g Test. at 59-60.) Regardless, the defense's suggestion that the Court should consider Maverick inadequately trained or his certification invalid based solely on his interpretation of the training requirements is a stretch. The other criticisms hinted at by Defendant—ambient odors, cueing, "metering," and rewarding—ultimately do nothing to affect this determination.[10]    Therefore, I

---

[10]Defense counsel's cross-examination of Trooper Lippmann also hinted at possible cueing, distracting odors, and techniques for rewarding Maverick. Trooper Lippmann testified that he

recommend the Court conclude Maverick's alert/indication established probable cause for the search of the vehicle.

Thus, the Court is presented with two bases for the stop: the suspended license and the drug investigation. The Court is also presented with two bases for a probable cause search, the dog sniff and the drug investigation. If the Court agrees with me that there was probable cause or reasonable suspicion to stop the 4Runner and that there was probable cause for the search, it could end its analysis here because of the automobile exception. *See Kennedy*, 427 F.3d at 1140-41. Because the law enforcement also obtained a warrant to search the vehicle after towing it, I will also address issues raised about the warrant.

**E.** **Whether the search warrant contains probable cause if the Police Service Dog's sniff is excised**

**1.** **Relevant law**

"The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a 'particular[ ] descri[ption of] the place to be searched, and the persons or things to be seized,' and (3) be based 'upon probable cause, supported by Oath or affirmation.'" *United States v. Skarda*, 845 F.3d 370, 375 (8th Cir. 2016) (quoting *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994), in turn quoting U.S. Const. amend. IV). "A magistrate judge may issue a search warrant 'upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place.'" *Skarda*, 845 F.3d at 376 (quoting *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that

---

varies rewards to keep Maverick "accountable." The result of this inquiry is ultimately too insubstantial to affect the credibility Trooper Lippmann's testimony or the reliability of the sniff or amount to more than speculation.

contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)); *see also United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021) ("Probable cause is a fair probability that . . . evidence of a crime will be found in the location to be searched") (quoting *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996))). "In assessing whether a warrant is sufficiently particular, [courts] consider the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Ivey*, 91 F.4th 915, 918 (8th Cir. 2024) (citation omitted). The particularity requirement "is one of 'practical accuracy rather than a hypertechnical one.'" *Id*. (quoting *United States v. Schave*, 55 F.4th 671, 675 (8th Cir. 2022)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

As mentioned above, it is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted); *see also United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) ("In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause."). "The Fourth Amendment requires that the issuing 'magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Maccani*, 49 F.4th 1126, 1130 (8th Cir. 2022)

(quoting *Gates*, 462 U.S. at 236); *see also United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017) ("The role of a reviewing court is to ensure the magistrate issuing the warrant 'had a "substantial basis for concluding that probable cause existed"'") (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016), in turn quoting *United States v. Garcia-Hernandez*, 682 F.3d 767, 771 (8th Cir. 2012))). "When the issuing magistrate relies solely on a supporting affidavit in determining probable cause, . . . 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Saddler*, 19 F.4th 1035, 1039 (8th Cir. 2021) (quoting *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020)). "The issuing court's probable cause determination 'should be paid great deference by reviewing courts.'" *Johnson*, 848 F.3d at 876 (quoting *United States v. Brewer*, 588 F.3d 1165, 1170 (8th Cir. 2009)).

The substantial basis standard requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). "[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). Conclusory statements, however, "made by affiants fail to give the issuing magistrate a substantial basis for determining probable cause exists." *United States v. Summage*, 481 F.3d 1075, 1077-78 (8th Cir. 2007). "In

45

addition to probable cause that contraband or evidence of a crime will be found, 'there must [also] be evidence of a nexus between the contraband and the place to be searched.'" *United States v. Randle*, 39 F.4th 533, 536 (8th Cir. 2022) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). This requires "'a "nexus" between the evidence to be seized and the place to be searched, considering "the nature of the crime and the reasonable, logical likelihood of finding useful evidence."'" *Schave*, 55 F.4th at 676 (quoting *United States v. Smith*, 21 F.4th 510, 515 (8th Cir. 2021), in turn quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)).

Defendant bears the burden of proving the warrant was issued without probable cause. *See Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence") (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)); *United States v. McGuire*, No. CR 13-40058, 2013 WL 5516192, at *3 (D.S.D. Oct. 1, 2013) ("A movant seeking to suppress evidence under a regularly issued warrant has the burden to show that the warrant was issued without probable cause") (quoting *United States v. Sierra–Garcia,* 760 F. Supp. 252, 262 (E.D.N.Y. 1991)), *R. & R. adopted,* 2013 WL 6449893 (D.S.D. Dec. 10, 2013). "In doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982) (quoting *United States v. Christenson*, 549 F.2d 53, 55 (8th Cir. 1977)); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.").

## 2.   Analysis

In *Florida v. Harris*, the United States Supreme Court held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  568 U.S. 237, 246 (2013).  The Supreme Court explained that:

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.  After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

*Id*. at 246-47.  The Supreme Court noted, however, that:

> A defendant . . . must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses.  The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty.  So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings.  Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant[.] . . . And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

*Id*. at 247.  I note that, unlike the case at bar, *Harris* did not mention a search warrant and it appears the search of the vehicle in question occurred immediately after the dog alerted, perhaps a warrantless search pursuant to the automobile exception.  I see no

reason, however, that if, "a defendant . . . must have an opportunity to challenge such evidence of a dog's reliability," as required by *Harris*, that opportunity should be negated by the issuance of a warrant, at least in the instant case. Here, even though law enforcement obtained a warrant, that warrant relied, in part, on the presumed reliability of certified dog's alert/indication. However, because the warrant also relied on other facts outside the dog's alert/indication, the proper course of action, if the Court disagrees with me on the reliability of the police service dog's alert/indication, should be to excise that information from the affidavit to determine if the warrant was supported by probable cause.

I concluded in section *III.C.2* above that law enforcement had probable cause to stop and search the 4Runner based on the drug-trafficking investigation. As I noted, I relied solely on the facts known to law enforcement before the stop as shown in the warrant application. This was necessary because I could not determine from Special Agent Mulnix's detention hearing testimony what else law enforcement might have known prior to the stop. Having determined there was probable cause for law enforcement to *stop and search* the 4Runner based on the automobile exception, *see Kennedy*, 427 F.3d at 1140-41, and before the dog sniff, it would be difficult for me to conclude that there was not a substantial basis for the issuing judge to find probable cause to approve the search warrant. In other words, for the reasons set forth in section *III.C.2* above, the Court should conclude that, even without the open-air sniff of the 4Runner, there was a substantial basis for the issuance of the warrant.

**F.** **Whether the Leon *good faith exception applies***

**1.** **Relevant law**

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers

48

executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based

on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

### 2. *Application*

Defendant contends that the "stale" information about the March and November 2024 package deliveries and the PSD sniff should be excised. Defendant cites no authority for excising stale information from the affidavit and I see no justification to do so. Law enforcement did not misrepresent the dates of those deliveries or leave the impression they had been more recent. This matter is not before the Court pursuant to *Franks* where the Court might be called upon to excise information illegally obtained. *See Franks v. Delaware*, 438 U.S. 154, 171-72 (1978) (providing for the excision of false information contained in a search warrant affidavit). Certainly, the dates of the deliveries, however old, should be considered in determining whether there was a substantial basis to support probable cause, as discussed above. However, there is no justification to excise the allegedly stale information, and the issuing judge was entitled to consider it. Here, there was a pattern of sending multiple packages over an extended period. Although only two previous deliveries had been surveilled, a pattern had emerged that was confirmed by Defendant and C.G. collecting the package from the rural Delhi address. Defendant's assertions about the "staleness" of the prior surveillance might be more persuasive but for this pattern.

Excision of the police service dog alert/indication is more complicated. Here, I have concluded there is no reason to exclude consideration of the alert/indication based on Maverick's training and/or certification. The Court may disagree with me. How,

then, should a police service dog's alert/indication be treated under *Leon* where law enforcement was truthful with the issuing judge about the dog's training and certification is only subsequently found to be defective?  Neither the parties nor I have found case law about how to treat truthful information regarding a police service dog's training and certification which is later determined to be defective when considering the good faith exception under *Leon*.   Nevertheless, I find that the evidence regarding the PSD alert/indication should not be excised under the circumstances presented here.  If there was evidence that law enforcement misrepresented a dog's training and certification to an issuing judge, the evidence might be excised under *Franks*.  *See Franks*, 438 U.S. 154 at 171-72.  It might also be excised under *Leon* because it would serve the purpose of deterring police misconduct in training and certifying drug detection dogs.  I suppose there could also be an extreme case where a dog is trained and certified under such obviously inadequate standards that such representations, though technically true, are worthless.[11]   In the instant case, however, the only allegation is Defendant's general dissatisfaction with the hours Maverick spent in training.  I see no basis to excise the PSD alert/indication, as suggested by Defendant, where the law enforcement provided truthful information about Maverick's training and certification—even if it is later determined to be inadequate.

While Defendant claims the issuing judge abandoned his judicial role and/or the warrant was so facially deficient, ultimately none of the four scenarios contemplated by *Leon* apply here.  There is no allegation or evidence that the affidavit in support of the search warrant contained any false statements or that the issuing judge was misled in any way.  There is no allegation or evidence that the issuing judge "wholly abandoned" his

---

[11] As an extreme example, it would be difficult to conclude law enforcement relied on a warrant in good faith if the attesting officer knew the dog in question was barely housebroken and certified to "indicate" whenever it was walked around a car.

judicial role in issuing the search warrant. As discussed above, based on the affidavit in support of the warrant application, the issuing judge had a substantial basis and made "a practical and common-sense" determination, based on the totality of the circumstances, that "a search would uncover evidence of wrongdoing"; and therefore, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Kail*, 804 F.2d at 444; *Maccani*, 49 F.4th at 1130; *Proell*, 485 F.3d at 431. Indeed, the warrant application suggests that law enforcement surveillance had discovered Defendant in the 4Runner with a highly suspicious package that was located by a trained and certified drug dog. Finally, there is no basis to exclude any evidence that might render it "so facially deficient" that a police officer could not reasonably presume that the warrant was valid.

Moreover, as discussed above, I find that the traffic stop was legal, and law enforcement had probable cause to search the 4Runner. Nothing on this record shows that any officer's conduct related to the traffic stop was "clearly illegal." Instead, the record shows that the traffic stop never strayed from, let alone far from, the line of validity. *See Cannon*, 127 F.3d at 413. Thus, I find that law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable. *See id*. Accordingly, as an alternative, I recommend that Defendant's motion to suppress be denied under the *Leon* good faith exception.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress.  **(Doc. 43.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the

Case 6:25-cr-02059-CJW-MAR    Document 52    Filed 02/03/26    Page 52 of 53

parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** at Cedar Rapids, Iowa, this 3rd day of February, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa