IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESSE JON HARBACH,<br><br>Defendant. | No. 25-CR-2059-CJW-MAR<br><br>**ORDER** |

## I. INTRODUCTION

A Report and Recommendation ("R&R") by the Honorable Mark A. Roberts, United States Magistrate Judge, recommending that the Court deny defendant's motion to suppress, (Doc. 43), is before the Court (Doc. 52). Defendant filed an objection. (Doc. 54). For the following reasons, defendant's objection is **overruled**, the R&R is **adopted as modified**, and defendant's Motion to Suppress, (Doc. 43), is **denied**.

## II. STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's R&R, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake [ ] a de novo review of the disputed portions of a magistrate judge's [R&R]"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge

with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's R&R when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the Court reviews the disputed portions of Judge Roberts' R&R de novo.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (cleaned up) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A district judge may, however, elect to review an R&R under a more exacting standard even if no objections are filed. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985).

### III. DISCUSSION

#### A. *Procedural History*

On October 7, 2025, a grand jury returned an indictment charging defendant with one count of conspiracy to distribute a controlled substance—ice methamphetamine—in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846; and one count of possession with intent to distribute a controlled substance—ice methamphetamine—in violation of Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)(A). (Doc. 4).

On December 15, 2025, defendant filed a motion to suppress, requesting suppression of "[a]ll evidence seized from a March 10, 2025, search of [defendant] and a Toyota 4Runner." (Doc. 43, at 1). In support of his motion, defendant offered eight exhibits:

A. [United States Postal Inspection Service (USPIS)] Report of Activity for March 14, 2024
B. USPIS Report of Activity for November 4, 2024
C. Iowa State Patrol aerial surveillance video for March 10, 2025
D. Trooper Lippmann body camera video
E. Iowa State Patrol K-9 Deployment Detail Report for March 10, 2025
F. The Iowa Department of Public Safety ISP Police Service Dog Programs and Policy statement
G. Police Service Dog training records
H. March 10, 2025, search warrant for Toyota 4Runner

(*Id.*, at 1–2; Docs. 43-2 through 43-10). The government filed a resistance, (Doc. 48), and five exhibits:

1. Detention Hearing Transcript
2. Search Warrant for a 2008 Toyota 4Runner, Registered to Rebecca Jean Sellers[1]
3. Trooper Lippmann's Body Camera Video
4. PSD Maverick 2024 Certifications
5. Trooper Lippmann and PSD Maverick Training Records

(*Id.*, at 1–2; Docs. 48-2 through 48-6).

On January 8, 2026, Judge Roberts held a hearing on the motion. (Doc. 49). At the hearing, the parties offered their respective exhibits. (*Id.*; Doc. 53, at 3–4). The government called Iowa State Patrol Trooper John Lippmann. (Doc. 49; Doc. 53, at 4). Trooper Lippmann testified that before becoming a police service dog handler he attended "a 6- to 8-week narcotics camp and then an 8- to 10-, 11-week patrol camp." (*Id.*, at 6). Those trainings included "scent memorization, indication behavior, scenarios, all the way up to case law, learning about different case law for K-9 stuff" as well as "tracking, evidence recovery, and then apprehension work" all for the purpose of "training, building the dogs up." (*Id.*, at 6–7). Trooper Lippmann's current K-9 is Maverick, a six-and-a-half-year-old German shepherd who attended the same training camps. (*Id.*, at 7).

---

[1] Exhibits H and 2 appear to be the same document. (Docs. 43-10 & 48-3).

Trooper Lippmann and Maverick have worked together since September 2021. (*Id.*, at 8). Maverick was certified for narcotics the same year. (*Id.*, at 9). Maverick has been recertified annually since then, including in the detection of cocaine, heroin, methamphetamine, and marijuana. (*Id.*, at 11–12). Maverick was certified in March 2025. (*Id.*, at 15–16; Doc. 48-5). He also completed sixteen hours of training monthly, which consisted of some active sniffing and some other training. (*Id.*, at 17–18, 38). As part of that training, Maverick learned passive indication for when he smelled a narcotic odor, meaning that he would "sit, stand, lay down, or stare." (*Id.*, at 21–22). Maverick also naturally alerts to the smell of a narcotic through "large head snaps back towards the odor" or "quick little head snaps back and forth, all accompanied by deep rapid nasal breaths." (*Id.*, at 21).

Trooper Lippmann testified that he would need to see both an alert and an indication from Maverick before Trooper Lippmann determined that he had probable cause to search. (*Id.*, at 23, 33). Trooper Lippmann was unsure how often Maverick alerted and indicated but that law enforcement officers did not locate any controlled substances; he stated that he was unaware of any "false positive" alerts or indications and that every time Maverick indicated that there was an odor of narcotics "it was substantiated by the driver or whoever was in the vehicle that odor was present." (*Id.*, at 42, 59–60). He was sure, however, that after he gave the command to search for narcotics odors, Maverick would only give alerts and indications for the presence of narcotics, not for food. (*Id.*, at 51–52).

Regarding the traffic stop on March 10, 2025, Trooper Lippmann and Maverick responded within seconds of the stop of the vehicle. (*Id.*, at 25). They responded because other officers requested assistance with a search of a Toyota 4Runner. (*Id.*, at 56). While searching, Maverick alerted and indicated at the B-pillar of the 4Runner for the presence of narcotics. (*Id.*, at 53–54). Law enforcement officers eventually located four pounds of methamphetamine where Maverick indicated and alerted. (*Id.*, at 31).

On February 3, 2026, Judge Roberts issued his R&R, recommending that the Court deny defendant's motion to suppress. (Doc. 52, at 4). Defendant filed an objection, which includes objections to both Judge Roberts' factual and legal conclusions. (Doc. 54).

### B. Factual Objections

First, defendant takes issue with some of Judge Roberts' findings of fact, therefore, the Court reviews the facts de novo. First, defendant states that he "objects to the characterization of [Maverick's] behavior as 'head snaps'" at 1:31 in Exhibit 3. (Doc. 54, at 1). The Court finds that Judge Roberts was quoting Trooper Lipmann's testimony at the suppression hearing, and that after reviewing the transcript, Judge Roberts accurately quoted the testimony. *Compare* (Doc. 52, at 14) *with* (Doc. 53, at 27). In addition, in independently reviewing Exhibit 3, the Court observed Maverick's head move back and forth twice, movements that can fairly be described as "head snaps." (Doc. 48-4, at 1:30–:32). Thus, defendant's objection on this issue is overruled.

Defendant "also objects to the conclusion . . . that there was an alert by Maverick" at 1:34 in Exhibit 3. (Doc. 54, at 1). The Court again finds, first, that Judge Roberts was quoting Trooper Lippmann, who indeed said, "an alert there." *Compare* (Doc. 52, at 14) *with* (Doc. 48-4, at 1:30). In independently reviewing the exhibit, the Court observed that Maverick snapped his head back significantly at 1:32–:33 in Exhibit 3, which the Court finds is consistent with Trooper Lippmann's statement that there was "an alert there" rather than Maverick placing his paw on the side of the vehicle at 1:34. In addition, after returning to his patrol vehicle, Trooper Lippmann summarized the alerts: "sniff by the bottom seam of the front driver's—or, excuse me— front passenger's side door . . . sniffed the bottom seam of that door . . . and again, right by the B pillar of that seam on the bottom side of the door . . . gave a stand and stare indication." (Doc. 48-4, at 2:23–3:06). Thus, the Court finds additional support for the alert not being Maverick placing his paw on the side of the vehicle at 1:34 in Exhibit 4 but that he was

5

sniffing at the passenger's side door seam; the Court likewise finds that Maverick eventually gave a stand and stare indication. The Court also overrules defendant's objection on this issue.

Lastly, defendant objects to Judge Roberts' statement that "J.A. does not run a flooring company." (Doc. 54, at 2). In Exhibit 1, Agent Joshua Mulnix testified that J.A. "does run a flooring company or purported to." (Doc. 48-2, at 8). The Court finds that this statement is inconclusive as to whether J.A. does in fact run a flooring company, and given this incongruity, overrules defendant's objection on this last factual issue.

Apart from these factual objections by defendant, the Court has independently reviewed the entire record and finds no errors in Judge Roberts' detailed, comprehensive, and thorough findings of fact other than two inadvertent switches of 2025 to 2024. (Doc. 52, at 11, 39). Having reviewed Exhibits C, E, H, 2 and 3 the Court finds that the stop of the 4Runner and subsequent dog sniff occurred on March 10, 2025. *See* (Docs. 43-4, 43-6, 43-10, 48–3, and 48-4).

The Court also clarifies that Exhibit C depicts defendant driving the 4Runner at 11:25 a.m. on March 10, 2025. (Doc. 43-4, at 5:03). Only after the passenger retrieves a package from the front porch of the Pioneer Road address does defendant get into the passenger seat and the passenger begin driving the vehicle. (*Id.*, at 5:40–:42 (trooper pilot saying, "affirmative, they have switched positions")). Between the passenger taking over driving and the traffic stop of the vehicle, defendant and the vehicle are on continuous surveillance. (*Id.*, at 5:08–7:19). The search warrant author, likewise, states that "[a]t approximately 11:24 a.m. . . . [o]fficers observed [defendant] exit the driver's side of Subject Vehicle and enter the front passenger door." (Doc. 43-10, at 16; Doc. 48-3, at 16). Judge Roberts does not explicitly write when defendant was last observed driving, so the Court does not find that this fact needs correcting, but merely clarifies its independent conclusion. Excepting those two corrections to 2025 and clarification of defendant's driving timeline, the Court adopts Judge Roberts' factual findings in their

entirety. To the extent they are necessary, the Court includes additional facts in the analysis section below.

As summarized by Judge Roberts, the key facts here are that "law enforcement became suspicious that packages delivered to a rural Delhi, Iowa address by the United States Post Office between May 2023 and March 2025 contained controlled substances." (Doc. 52, at 4). "Defendant, whose license had been suspended, was first seen driving [a Toyota] 4Runner [March 10, 2025] at 10:20 a.m. when he drove to the rural Delhi residence. . . . Law enforcement then stopped the vehicle at 11:27:17 a.m." (*Id.*). "Trooper Lippmann arrived soon thereafter and used his Police Service Dog . . . to conduct a free-air sniff that disclosed the presence of a controlled substance in the 4Runner. . . . [L]aw enforcement obtained a warrant to search the 4Runner and [a] package. Ultimately, four pounds of methamphetamine were discovered[.]" (*Id.*). Regarding Judge Roberts' legal conclusions, because defendant objects to Judge Roberts' recommendation as to the legality of the stop of the 4Runner on March 10, 2025, the Court turns its de novo analysis there next.

### C. *Stop of the 4Runner*

Second, regarding the legal issues, defendant "objects to the conclusion that the stop of his vehicle was constitutional." (Doc. 54, at 2). He argues that "[j]ust as a parking violation takes place only when a vehicle is stopped or standing . . . a driving under suspension violation only happens when a person is operating the vehicle. Therefore, . . .the justification for the stop was stale." (*Id.*). The government responds that "[o]fficers observed defendant driving at 11:24 a.m. and stopped the vehicle he drove at 11:27 a.m. This is a reasonable time frame to conduct that stop." (Doc. 48-1, at 12).

As an initial matter, the Court reiterates its conclusion that officers observed defendant driving as late as 11:25 a.m. on March 10, 2025; the traffic stop of the 4Runner occurred just over two minutes later at 11:27 a.m. *See* (Doc. 43-4, at 5:08, 7:19; Doc. 43-10, at 16; Doc. 48-3, at 16 ("At approximately 11:27 a.m. officers initiated a traffic

stop on the Subject Vehicle.")).  The Court begins its analysis from that timeline of defendant driving.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const., amend. IV.  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).  "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir.1994) (en banc).  "An otherwise constitutional traffic stop is not invalidated by the fact that it was 'mere pretext for a narcotics search.'" *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) (quoting *United States v. Robinson*, 414 U.S. 218, 221 n.1 (1973))).  In fact, an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813.  In addition, a traffic stop is reasonable when it is supported by "an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006).  "Reasonable suspicion must exist at the time the traffic stop is made, and the passage of time 'between the occurrence of the facts supplied' and the traffic stop can render those facts too stale to support the existence of reasonable suspicion." *United States v. Rederick*, No. 4:20-CR-40066-01-KES, 2021 WL 4772222, at *7 (D. S.D. Oct. 13, 2021) (citing *United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008)).

"There is no bright-line test for determining when information is stale." *Stachowiak*, 521 F.3d at 856.  Rather, "[t]ime factors must be examined in the context of a specific case and the nature of the crime under investigation." *Id*.  When a crime is ongoing, the time necessary for information to become stale is longer. *Id*. (finding that a lapse of two weeks not too long); *see also United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010) (holding that a "lapse of time is least important when the suspected criminal activity is continuing in nature"); *State v. Sallis*, 981 N.W.2d 336, 346 (Iowa

2022) (finding that an officer could stop a driver to determine if his driving status was barred when the officer learned that the driver was barred two to six months prior).

Here, law enforcement officers observed defendant driving and knew that his driving status was suspended. Thus, they had probable cause to perform a traffic stop. In the two minutes' time between gathering that probable cause and the traffic stop, law enforcement officers maintained surveillance of defendant. Thus, the information that defendant had driven while under suspension was not stale, because law enforcement officers had actual knowledge that defendant's driving privileges remained suspended and thus his crime of driving while under suspension was ongoing. *See United States v. Woodrow*, No. 22-03028-01-CR-S-BP, 2023 WL 5197959, at *4 (W.D. Mo. July 21, 2023) (finding that "running the plates two weeks prior to the stop was enough to support reasonable suspicion and probable cause that Defendant had committed a license plate violation"). This is not a case in which defendant could have potentially remedied his defective driving status in the intervening time. *See Sallis*, 981 N.W.2d at 345 (finding that although a driver could have a valid driver's license after three years, a gap of two to six months was not enough time to presume the driver no longer was barred).

Defendant's cited cases to argue the contrary do not support a finding of staleness either. In *Copeland*, the alleged crime was a parking violation, which, according to the Sixth Circuit, still provided probable cause for a traffic stop one mile from the location of the parking violation. *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003) ("Logically, where an observed parking violation is not ongoing, an officer is required to effect a stop based upon this conduct within a reasonable period of time. Because a parking violation necessarily takes place only when a vehicle is stopped or standing, the time in which a moving vehicle can reasonably be stopped for a parking violation is relatively limited."). Likewise, the Fifth Circuit found that an observed failure to use a turn signal and parking in a disabled only parking space without a clearly visible placard were still sufficient probable cause to stop a vehicle fifteen minutes later as "the delay

9

here is not enough to negate the violation as grounds for the later stop." *United States v. Zuniga*, 860 F.3d 276, 282 (5th Cir. 2017) (citing *Copeland*). Thus, the Court concludes that while officers could have arrested defendant sooner, their failure to do so is not fatal and it does not render their probable cause invalid. The Court likewise finds that a delay of just over two minutes does not render the probable cause stale. Defendant's objection as to this issue is overruled.

### D. Police Service Dog's Alert

Third, defendant "objects to the conclusion that Maverick's alert was reliable and that it established probable cause for a search of the 4Runner." (Doc. 54, at 3). The government responds that "Maverick regularly trains narcotic detection and is accurate in his detection." (Doc. 48-1, at 15). In addition, the government points out that "Maverick and Trooper Lippmann are annually certified as Police Service Dog Narcotics Team." (*Id.*).

"Law enforcement officials require probable cause to search a vehicle without a warrant." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007). "A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir.1999). Regarding whether a dog is reliable,

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Florida v. Harris*, 568 U.S. 237, 246–47 (2013). However, the presumption of reliability "may be overcome if a defendant can show by cross-examination or opposing evidence the inadequacy of the certification or training program or that the circumstances

surrounding a canine alert undermined the case for probable cause." *United States v. Perez,* 29 F.4th 975, 986 (8th Cir. 2022). At the same time, a dog need not be perfect to be sufficiently reliable to support probable cause, and the Eighth Circuit has found that a fifty percent accuracy rate suffices. *United States v. Collier*, 1116 F.4th 756, 761 (8th Cir. 2024) (citing *United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014) and *Donnelly*, 475 F.3d at 946). And other indications of the presence of illicit drugs can rehabilitate a less-than-reliable canine alert. *Collier*, 1116 F.4th at 761 n. 3.

Here, the Court finds that defendant has not overcome the presumption that Maverick's alerts provided probable cause to search the 4Runner. Maverick was certified in March 2025 when he alerted and indicated to the presence of narcotics. He had been recertified November 12, 2024. He also completed sixteen hours of training annually including in 2024. Defendant did not present any evidence that Maverick was less than fifty percent reliable, and, in fact, Trooper Lippmann testified that he was unaware of any time in the five years that he had worked with Maverick that Maverick had indicated and alerted and there was no odor of a narcotic present. Thus, the Court finds that there was probable cause to search based on Maverick's alerts and indications at the passenger side door of the 4Runner, which were supported by law enforcement officers' observations of the passenger of the vehicle retrieving a suspicious package just two minutes prior. The Court so finds despite defendant's concerns about the date that the reports on Maverick's trainings were signed. *See* (Doc. 54, at 3). Defendant's objection on this ground is overruled.

### E. Challenge to the Warrant and the Leon *Good Faith Exception*

Defendant also objects to Judge Roberts' recommendation on the *Leon* good faith exception. (Doc. 54, at 3–4). Because the Court has already found probable cause supported the traffic stop and that Maverick's alert was reliable and established probable cause to search the 4Runner, the Court need not address the *Leon* good faith exception. *See United States v. Leon*, 468 U.S. 897 (1984). This issue is moot. *Sorcan v. Rock*

*Ridge Sch. Dist.*, 131 F.4th 646, 650 (8th Cir. 2025) (explaining that an issue is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party"). Defendant's objection on this last issue is overruled, and the Court denies defendant's motion to suppress.

## IV. CONCLUSION

For these reasons, defendant's objection (Doc. 54) is **overruled**. The Court **adopts as modified** the R&R. (Doc. 52). Defendant's Motion to Suppress (Doc. 43) is **denied**.

**IT IS SO ORDERED** this 25th day of February, 2026.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa